# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

THERESA BARACKER,

    Plaintiff,

v.                                                                           CV 16-378 WPL/KK

RYAN ZINKE, Secretary, U.S.
DEPARTMENT OF THE INTERIOR; and
OFFICE OF THE SPECIAL TRUSTEE
FOR AMERICAN INDIANS,

    Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendant Ryan Zinke, Secretary of the United States Department of the Interior ("DOI"), moved for summary judgment on all of Plaintiff Theresa Baracker's claims. (Doc. 31.) The parties stipulate that the claims are as follows: Claim 1 – discrimination based on a hostile work environment created by Baracker's former supervisor, Michelle Tenorio; and Claim 2 – retaliation, which occurred when Tenorio disclosed the content of Baracker's informal Equal Employment Opportunity ("EEO") complaint to other employees, and when Baracker's second-level supervisor and Director of the Office of the Special Trustee, Ethel Abeita, rescinded Baracker's internal request for Tenorio's travel vouchers from 2005. (Doc. 37 Ex. 3 ("Stipulation Regarding Claims Being Pursued by Plaintiff").) For the reasons explained herein, I grant Secretary Zinke's motion for summary judgment, enter judgment in favor of the Defendants, and dismiss this case with prejudice.

Unless otherwise noted, the following facts are undisputed. Baracker works for DOI. Between January 24 and May 22, 2011, Baracker served as a Supervisory Records Management Specialist, Branch of Southern Field Support Services, Division of Records Management

Policies, Procedures and Training, Office of the Special Trustee ("OST"), Office of Trust Records ("OTR"). Between January 24 and May 22, 2011, Tenorio was Baracker's immediate supervisor and served as the Supervisory Program Analysis Officer, OTS. Between January 24, 2011, and September 8, 2012, Abeita was Baracker's second-level supervisor and served as the Director of the OTR. Benedict "Alley" David is another DOI employee, in roughly the same position as Baracker and during the same relevant time period, who was supervised by Tenorio and had Abeita as his second-level supervisor. David served as a Supervisory Records Management Specialist, Branch of Northern Field Support Services, OST. Baracker alleges that the hostile work environment created by Tenorio existed between March 9 and April 18, 2011.

Sometime between approximately 2003 and 2006, Baracker was Tenorio's supervisor. An issue arose regarding Tenorio's use of a government credit card and the loss or theft of a government laptop. During this period, in 2004, Tenorio apparently told another DOI employee, Deborah Benally, that Tenorio enjoyed pushing Baracker's buttons and making Baracker cry.

Baracker worked on an alternative work schedule ("AWS") that allowed her to have every other Friday off. On March 9, 2011, Tenorio advised Baracker that she was considering removing Baracker from her AWS. While Tenorio declared, under penalty of perjury, that she "was contemplating recommending that all managers be placed on a standard 40-hour workweek to better handle the workload of the office" (Doc. 31 Ex. 2 at 4, ¶ 10 (Decl. of Michelle Tenorio, Mar. 22, 2017) ("Tenorio Decl.")), Baracker would have been the only manager affected by this change.

While Baracker was never removed from her AWS, Tenorio did schedule at least two managers meetings during the two pay periods following this conversation. Tenorio did not generally schedule managers meetings on Fridays.

2

Two days later, on March 11, 2011, Baracker asked Tenorio to provide discretionary training on OST's Versatile system (a computer and data management system) to Baracker's staff. Tenorio denied the request and instructed Baracker to conduct the training herself. Baracker asserts that she was unfamiliar with the Versatile system and unable to provide the training. Approximately two weeks later, David made a similar request of Tenorio, which was granted. The training was ultimately provided to David's staff and Baracker's staff sometime in late June 2011.

On March 15, 2011, Tenorio sent Baracker an email asking her to follow up on a records issue and specifically instructing Baracker to "not delegate [this] to Claudeen [Crank] at this time." (Doc. 31 Ex. 2 at 3; Doc. 35 at 11.) Crank was Baracker's subordinate at the time. Tenorio provided no reason or explanation, in the email, as to why the task could not be delegated to Crank, despite the fact that Crank had served as the point of contact for the records issue for several years.

Baracker followed up with Tenorio with a status report on the issue several days later. Tenorio responded by email stating, "Received word you made contact. Keep me posted, will you have Claudeen work on this issue now?" (Doc. 31 Ex. 2 at 9.) Baracker responded that she and Crank would work on the issue and keep Tenorio apprised as necessary.

On March 17, 2011, the Office of Justice Services ("OJS") emailed Abeita seeking permission to return records to District II, in Arizona, for processing and eventual return to the American Indian Record Repository ("AIRR"). On March 18, 2011, Tenorio emailed Baracker and instructed her to draft a response memorandum to OJS granting the request. The email stated "Try to work this out so that we are not going back and forth with memoranda. All drafts and reviews should be completed and ready for final before coming to me." (Doc. 31 Ex. 2 at 16.)

Tenorio again emailed Baracker on March 24, 2011, seeking a status update. Baracker responded that she was finalizing the memorandum. Baracker gave the memorandum to Tenorio on March 25, 2011. The memorandum contained grammatical errors and other mistakes. Tenorio emailed Baracker and expressed concerns about the written product, and asked questions like, "Are you not thoroughly reviewing your correspondence?"; "Are you not hearing or understanding verbal direction?"; and "Are you rushing? Yesterday was another occasion where I saw you rushing and desperately trying to get me information (day before your RDO)." (*Id.* at 14.) Ultimately, the memorandum went back and forth between Tenorio and Baracker several times before being sent out.

On April 13, 2011, Tenorio emailed Baracker informing her that two of her subordinates failed to log off at the end of the day, and therefore failed to comply with OST rules concerning computer usage. On April 14, 2011, Baracker cleared up the issue as to one employee and informed Tenorio that she would speak with the other subordinate, Novella Hunt, about logging out. Baracker did speak with Hunt.

Later on April 14, 2011, Hunt drafted an inappropriate and uncomplimentary email and sent it, evidently inadvertently, to Tenorio. Hunt rapidly apologized. Later still, Tenorio again emailed Baracker and let her know that Tenorio and Hunt had spoken, Tenorio had reiterated the importance of logging off, and Hunt had again apologized. Tenorio's email read as follows:

> I don't know how you relayed this information to Novella but obviously she was quick to react. I did talk to her after our conference call this afternoon and did reiterate the importance related to OST Network Rules of Behavior and Standard rules [sic] of Conduct. She again did verbally apologize and I would hope not to expect this type of incident occurring in the future.

(Doc. 31 Ex. 2 at 6.)

On March 28, 2011, Baracker sent a memorandum voicing her intent to file a discrimination complaint against Tenorio to an EEO Counselor in OST. Abeita, Tenorio, and Baracker met on April 18, 2011, to discuss the issues raised in the March 28 Memorandum. The issues were not resolved at this meeting. Later in April, Baracker and Abeita met again—without Tenorio—to discuss the issues raised in the March 28 Memorandum. At the second meeting, Baracker requested that she be detailed to the Budget, Finance and Administration Office ("BF&A) of the OST.

Baracker alleges that Tenorio told Kathy Tapp, a Supervisory Program Analysis Officer in the OST in Lexana, Kansas, that Tenorio planned to laugh at Baracker during the first meeting with Abeita and attempt to discourage Baracker from pursuing her claims. (Doc. 1 at 3.) Baracker also claims that, in retaliation for having filed the EEO claim, Tenorio disclosed the contents of the EEO memorandum to Tapp. (*See* Doc. 35 at 14-15.) Baracker further contends that Tapp disclosed the same information to another DOI employee, Lena Mills. (*Id.* at 8.)

Finally, sometime after she was detailed to BF&A, Baracker submitted a request for records to the OST, seeking Tenorio's travel vouchers from the 2005 timeframe in which Tenorio allegedly misused a government credit card and lost a government laptop. Alley originally approved her request. However, after Tapp received the request at the AIRR, she contacted Abeita. Tapp informed Abeita that, in her opinion, Baracker's request was inappropriate because it would have provided Baracker with Tenorio's personal identifying information ("PII") if processed as requested. Abeita then instructed Tapp not to process the request as drafted. Abeita contacted the Freedom of Information Act ("FOIA") officer and had Baracker's records request processed as a FOIA request. Baracker ultimately received the same documents she had originally requested, but without Tenorio's PII.

After Baracker was detailed to BF&A, she filed a formal EEO complaint against Tenorio and proceeded through the administrative process.

Based on the foregoing, Baracker brings two claims: hostile work environment discrimination based on sex and tribal affiliation; and retaliation by Tenorio and Abeita for filing the EEO memorandum and eventual complaint against Tenorio.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of "'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). Once the moving party has met this burden, the nonmoving party must identify specific facts that show the existence of a genuine issue of material fact requiring trial on the merits. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). The nonmovant must identify these facts by reference to "affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671. A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Id.* A mere "scintilla" of evidence is insufficient to successfully oppose a motion for summary judgment. *Id.* at 252. The record and all reasonable inferences from it must be viewed in the light most favorable to the nonmovant. *See Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable

jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In a case such as this, where the burden of persuasion at trial would be on the nonmovant, the movant can meet Rule 56's burden of production by either (1) providing affirmative evidence negating an essential element of the nonmovant's claim or (2) showing the Court that the nonmovant's evidence is insufficient to demonstrate an essential element of the nonmovant's claim. *Celotex*, 477 U.S. at 331 (citations omitted). Evidence provided by either the movant or the nonmovant need not be submitted "in a form that would be admissible at trial." *Id.* at 324. Rather, the content of the evidence presented must be capable of being presented in an admissible form at trial. *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006). For example, parties may submit affidavits to support or oppose a motion for summary judgment, even though the affidavits constitute hearsay, provided that the information can be presented in another, admissible form at trial, such as live testimony. *See* FED. R. CIV. P. 56(c)(4); *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010); *Trevizo*, 455 F.3d at 1160.

To survive summary judgment on a claim for a hostile work environment based on gender and tribal affiliation, actionable pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., a plaintiff must show "that a rational jury could find that 'the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'" *Davis v. United States Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986))); *see also MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005). "General harassment if not racial or sexual is not actionable."

*Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994). Specifically, the plaintiff must show "that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, *Meritor*, 477 U.S. at 67 . . . , and (2) the harassment was racial [or sexual] or stemmed from racial [or sexual] animus." *Bolden*, 43 F.3d at 551. When evaluating whether a working environment is "sufficiently hostile or abusive, [courts] examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *MacKenzie*, 414 F.3d at 1280 (citing *Harris*, 510 U.S. at 23). The environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998); *Davis*, 142 F.3d at 1341.

Title VII is not a "general civility code." *Faragher*, 524 U.S. at 788 (quotation omitted). "Properly applied, [the standards for judging hostility] will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (quotation omitted).

In this instance, it is unnecessary to address whether any harassment suffered by Baracker stemmed from gender or tribal affiliation because no reasonable jury could conclude, based on the record, that the harassment was pervasive or severe enough to alter the conditions of employment and create an abusive working environment.

Baracker concedes that no one event was severe enough to create a hostile work environment, but contends that the incidents, when viewed as a whole, were sufficiently pervasive to create such an environment. (Doc. 35 at 15-16.) Baracker contends that Tenorio

threatened to revoke her AWS, denied her request for discretionary training, assigned unclear tasks and criticized her work, usurped her supervisory authority, threatened her in an email, told another coworker that Tenorio would laugh at her, and verbally and visibly expressed hostility by telling her that Tenorio enjoyed pushing her buttons and making her cry.

The Tenth Circuit addressed a similar factual scenario in *Trujillo v. University of Colorado Health Sciences Center*, in which the plaintiff brought a claim for a racially hostile work environment. 157 F.3d 1211 (1998). In *Trujillo*, Mr. Trujillo, a Hispanic man, alleged a hostile work environment. Trujillo worked at the University of Colorado Health Sciences Center ("UCHSC"), in the Center for MultiCultural Enrichment ("CFME"). *Id.* at 1213. CFME hired Dr. Mackie Faye Hill, a black woman, to be the new Director. *Id.*

Trujillo alleged that the following instances created a hostile work environment: 1) Dr. Hill "documented improprieties in his job performance"; 2) Dr. Hill "criticized and checked on his work"; 3) Dr. Hill "sent him memos requesting Leave Request and Approval forms for dates when he was absent from the office"; 4) supervisors instructed him "to cancel a request for leasing space in a building to operate a program he supervised"; 5) "UCHSC refused to refurbish the building that he found to operate his program"; 6) "his request to attend a leadership program for Hispanics was not approved"; and 7) "he was not included as one of the UCHSC representatives to the Latin American Educational Fund Anniversary Dinner." *Id.* (alterations and quotations omitted). There were some other issues, as well. For example, the code was changed to the lock on the office containing the Xerox machine and someone forgot to give Trujillo the new code. He wrote to Dr. Hill about this issue and it was resolved the next day. *Id.* Trujillo was "required to bring a final budget for one of his programs to a meeting, and . . . a year later he was excluded from part of the budgeting process for one of his programs." *Id.*

Furthermore, "Dr. Hill placed a corrective action in [Trujillo's] personnel file that warned him that he needed to improve his attendance, . . . not offer employment positions without involving her in the process, and . . . not . . . produce and distribute the Pre-Collegiate Program Newsletter without first presenting it to her for review and approval." *Id.*

During this period, UCHSC experienced budget difficulties and the Office of Academic Affairs recommended the elimination of Trujillo's position to satisfy budgetary needs. *Id.* Dr. Hill informed Trujillo that his position was being eliminated, but he was not discharged immediately. In fact, his position was funded for another year through a one-time grant. When the grant ended a year later, Trujillo "was discharged due to lack of funds." *Id.* at 1214.

The Tenth Circuit analyzed the first prong of a hostile work environment and considered the four factors used to evaluate the totality of the circumstances: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23). The *Trujillo* Court concluded that Trujillo fell "short of making a showing of pervasive or severe harassment," and stated that "[t]he record . . . provides evidence of little more than a collection of unrelated incidents where Plaintiff and Dr. Hill were at odds." *Id.* The Court went on to state that "Plaintiff was not subjected to anything that was physically threatening or humiliating, nor was he subjected to any offensive utterances. Plaintiff's list of grievances includes none of the racial comments or ridicule that are hallmarks of hostile work environment claims." *Id.* (citations omitted). Finally, the *Trujillo* Court stated that the "hostile work environment that Plaintiff portrays is simply a work environment that exhibits the monitoring and job stress typical of life in the real world. Normal job stress does not constitute a hostile or abusive work environment." *Id.*

The events and analysis of *Trujillo* track nicely with the events in this case. The events in this case took place over an approximately five-week period while Tenorio was Baracker's supervisor. Baracker argues that Secretary Zinke "disregards the severe physical, mental, and emotional distress caused by Ms. Tenorio's continual mistreatment of Plaintiff, including the threat to revoke her AWS privilege." (Doc. 35 at 10.) However, Baracker, like Trujillo, failed to establish anything other than a handful of incidents that appear unrelated and rather normal. Baracker does not complain of slurs based on gender or tribal affiliation, nor was she ever physically assaulted. Tenorio denied Baracker discretionary training, informed Baracker that she was considering altering Baracker's permissive schedule to accommodate the needs of the office, and sent an email to Baracker expressing a wish not to have future issues with a subordinate. While Baracker and Tenorio clearly did not get along, Baracker adduced evidence only that Tenorio might be a bad manager, not that Baracker was subjected to a hostile work environment.

In a bid to save her claim, Baracker contends that Tenorio's 2004 statement to Deborah Benally "establish[es] the animus Ms. Tenorio held toward Plaintiff, which ultimately contributed to the hostile work environment in 2011." (Doc. 35 at 14.) Baracker fails to present any argument or theory as to how the tension in 2004, when Baracker was Tenorio's supervisor, translates to the 2011 situation.

Secretary Zinke correctly points out that the statement allegedly made to Benally in 2004 is inadmissible hearsay. Baracker asserts that this statement is admissible pursuant to Federal Rule of Evidence 801(d)(2)(D) as a statement "offered against an opposing party and . . . made by the party's agent or employee on a matter within the scope of that relationship and while it existed." In the context of employment and personnel matters, the Tenth Circuit has explained that "[i]n order for a statement to qualify as an admission of a party opponent, the speaker 'must

11

be involved in the decisionmaking process affecting the employment action involved.'" *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) (quoting *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003). It is unclear how, and Baracker has presented no argument suggesting that, Tenorio or Benally were engaged or involved in any decisionmaking process affecting an employment action in 2004 or otherwise acting within the scope of their employment for purposes of Rule 801(d)(2)(D). While Baracker is correct that she could call Benally at trial, she chose not to depose Benally or obtain an affidavit from Benally. Benally's statement is inadmissible hearsay and I cannot consider it at this stage. However, even if Benally's statement were included, it would not change the calculus of this case.

Next, Baracker alleges that Tenorio told Tapp, who told Mills, who told Baracker, that Tenorio would laugh at Baracker and take steps to discourage Baracker from pursuing an EEO claim, and also that Tenorio disclosed the content of Baracker's EEO complaint. (Doc. 35 at 14-15.) It is undisputed that Tenorio did not, in fact, laugh at Baracker or make any attempt to discourage Baracker from pursuing her claims. However, in her October 2012 deposition, Tapp testified that Tenorio "probably informed me that [Baracker's EEO] complaint had been filed, but it was in a general discussion." (Doc. 35 Ex. 6 at 2 (Tapp Dep., Oct. 30, 2012, 13:25-14:3).) Tapp further stated that she did not need to calm Tenorio down and that she did not recall Tenorio making any disparaging remarks about Baracker. In her March 2017 Declaration, Tapp again declared that while Tenorio did inform her that Baracker had lodged a complaint against Tenorio, "Ms. Tenorio did not tell [Tapp] whether it was a grievance or EEO complaint[; n]or did Ms. Tenorio tell [Tapp] the details of the complaint or disclose the contents of the complaint." (Doc. 31 Ex. 4 at 1 (Decl. of Kathy Tapp, Mar. 15, 2017).)

There is no evidence in the record, even under the most favorable reading, to suggest that Tenorio did, in fact, disclose the content of Baracker's EEO process.

No "rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [Baracker's] employment and create an abusive working environment." *Davis*, 142 F.3d at 1341 (quotations omitted). Just as the Tenth Circuit concluded in *Trujillo*, the evidence in this case paints a picture of several unrelated incidents in which Baracker and Tenorio disagreed or otherwise did not get along, but these are instances of normal workplace stress.

Because I conclude that no rational jury could find the events described by Baracker to constitute a hostile work environment, it is unnecessary to determine whether any of these events were motivated by gender or tribal animus. It is further unnecessary to determine what treatment to give Baracker's affidavit of her subjective experience. Therefore, I grant Secretary Zinke's motion for summary judgment as to the hostile work environment claim.

Baracker's claim for retaliation similarly fails. When a plaintiff brings a claim for retaliation in violation of 42 U.S.C. § 2000e-3, and attempts to prove that claim through indirect or circumstantial evidence, courts turn to the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Title VII "forbids retaliation against employees who voice opposition to, or participate in an investigation or proceeding alleging, an unlawful employment practice by his or her employer." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (citing 42 U.S.C. § 2000e-3(a)). Under *McDonnell Douglas*, the plaintiff must first make out a prima face case of retaliation. To make out a prima facie case for retaliation, the plaintiff "must demonstrate that (1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found

13

material; and (3) a causal nexus exists between her opposition and the employer's adverse action." *Id.* at 1176. The burden then shifts to the defendant to "articulate a legitimate, non-discriminatory reason" for the events. *Id.* at 1173. If the defendant succeeds in this endeavor, the presumption falls away and the plaintiff bears the burden of proving her case.

Baracker's claim fails at the first step of the analysis. Baracker asserts that she was retaliated against in two ways: first, Tenorio disclosed the contents of Baracker's EEO complaint (Doc. 35 at 17-18); and second, Abeita "rescind[ed] [Baracker's] records request" (*id.* at 18-19). Even if both of these things are true, Baracker did not suffer—and does not contend that she suffered—an adverse employment action. *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1189-90 (10th Cir. 2002) (plaintiff failed to prove a "materially adverse employment action" when she showed that she was "taken out of the information loop," when her company "attempt[ed] to transfer her to a new position," and "when her report of complaints . . . was treated as a claim of sexual harassment, resulting in ridicule"); *see also Sanchez v. Denver Public Schs.*, 164 F.3d 527, 533 (10th Cir. 1998) ("Courts considering the issue have held that "'unsubstantiated oral reprimands' and 'unnecessary derogatory comments'" . . . are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status. *See, e.g.*, *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1301 (3d Cir. 1997); *see also Sweeney v. West*, 149 F.3d 550, 556-57 (7th Cir. 1998)."). At no point did Baracker suffer a decrease in wages, decrease in grade, decrease in seniority, failure to promote, failure to hire, or any of the other hallmarks of an adverse employment action. *See Sanchez*, 164 F.3d at 533 ("Retaliatory conduct other than discharge or refusal to rehire is thus proscribed by Title VII only if it alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affects his or her statues as an employee. It follows that not everything that makes an

employee unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." (quoting *Robinson*, 120 F.3d at 1300) (internal citations and alterations omitted)). In fact, Baracker herself testified that there was "no impact in terms and conditions of [her] employment." (*See, e.g.*, Doc. 31 Ex. 1 at 26 (Baracker Dep. 138:8-10).) Absent an adverse employment action, Baracker cannot make out a prima facie case of retaliation.

Because Baracker failed to carry her burden at step one of the *McDonnell Douglas* framework, her claim fails. Therefore, I grant Secretary Zinke's motion for summary judgment on Baracker's retaliation claim.

Having granted Secretary Zinke's motion for summary judgment on all counts, I dismiss this case with prejudice and will enter a separate Judgment in accordance with Federal Rule of Civil Procedure 58.

IT IS SO ORDERED.

_William P. Lynch_
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.